

**IT IS ORDERED as set forth below:**

**Date: March 20, 2017**



_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 14-65320-WLH |
| | ) | |
| ROCKY RENÉ WHITE, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | JUDGE WENDY L. HAGENAU |
| | ) | |
| | ) | |
| ROBBIE WHITE, PHYLLIS WHITE, | ) | |
| Individually and as Administrator for the | ) | |
| Estate of THELMA BROWNLEE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 14-5331 |
| | ) | |
| ROCKY RENÉ WHITE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER AFTER TRIAL ON COMPLAINT**
**TO BAR DISCHARGE UNDER 11 U.S.C. § 727**

This matter is before the Court on a Complaint to bar the Debtor's discharge under 11

U.S.C. § 727 filed by his brother and sister-in-law.[1]  After four days of trial, where the Debtor

_____

[1] The Complaint also seeks a determination of the dischargeability of Plaintiffs' claims under Section 523.  The Court bifurcated the trial, hearing only the claims under Section 727 initially.  The trial of the claims under Section 523 will be separately scheduled.

1

represented himself *pro se*, the Court is prepared to enter its Findings of Fact and Conclusions of Law on the Section 727 allegations. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## FINDINGS OF FACT

Although the determination of whether the Debtor is entitled to a discharge is based on the Debtor's actions during and leading up to the filing of the Debtor's bankruptcy case on August 5, 2014, the saga actually begins in the mid-1980s. The Debtor is one of a number of children, among them, an older brother, Robbie, a Plaintiff in this case, and a younger brother, Rudy. The Debtor never completed high school, attending school only through the ninth grade. The Debtor worked on several inventions in the 1980s and 1990s, including one for aeration which eventually led to the development of a waste water treatment system. His brother Robbie and others worked with him on the development of these projects. Robbie also worked as a superintendent for a home builder. The Debtor and others formed several companies in which this work was conducted. The Debtor borrowed money from Robbie and others to develop the project. At various times, the Debtor or the companies for which he worked paid money to or on behalf of Robbie – as salary, as payment of loans, or as payment of expenses that were otherwise Robbie's responsibilities such as for his truck or taxes.

*Companies*

By 1998, the Debtor was operating through a company called Ibex with three individuals, Tom Limbach, Keith Breedlove and Ed Breedlove. The Debtor asserts he held approximately 76% of the company while the other three held 8% each. Somewhere around 2001, Larry Bradford began working with the venture and a lab for the Debtor's unfinished wastewater treatment process was subsequently built at Larry Bradford's home. The Debtor contends he gave Larry Bradford 25% of "the company" from his interest, thus reducing his interest to 51%.

The Debtor and Larry Bradford filed at least three patents on this wastewater treatment process. Because Tom Limbach helped finance the building of the lab at Larry Bradford's home, the Debtor contends he gave Mr. Limbach another 11% interest in the "company".

On or about October 19, 2001, the limited liability companies NJUN, LLC, NJUN Technologies, LLC, and NJUN Holding, LLC (the "NJUN Companies") were formed in Georgia for the purpose of developing the Debtor's wastewater treatment system and bringing it to market. The system became known as the NJUN wastewater treatment system. The Debtor was an original member of the companies with Tom Limbach, Ed Breedlove, Keith Breedlove and Larry Bradford. In 2002, the NJUN Companies were approached by a potential purchaser. Under the terms of the purchase, the Debtor would be bought out of the company. This potential purchase was never consummated. According to the operating agreement for NJUN, LLC dated February 12, 2002, the Debtor then held 37% of NJUN, LLC through his company NJUN Holding, LLC of which he owned 100%. Mr. Limbach, Mr. Bradford and the Breedloves owned the balance of NJUN, LLC. A similar ownership structure was in place for NJUN Technologies.

Around 2003, Kevin Ringo ("Mr. Ringo") and Guy Abernathy ("Mr. Abernathy"), who were civil engineers and surveyors, agreed to pay business loans of the Debtor to Brand Bank in return for receiving approximately 2.5% interest each in NJUN Holding. This further reduced the Debtor's effective interest in NJUN, LLC. In 2005, NJUN Holding agreed to pay $1.5 million to some combination of other holders of interests in NJUN, LLC in order to obtain a 51% interest in NJUN, LLC and regain control of the company. Mr. Ringo and Mr. Abernathy contributed all or a portion of those funds and at the time obtained a greater interest in NJUN Holding. Thereafter, NJUN Holding was the managing member of NJUN, LLC, and the Debtor was the managing member of NJUN Holding.[2] By 2007, Mr. Ringo and Mr. Abernathy held a

---

[2] The 2005 Agreements were not submitted as evidence.

44.1% interest in NJUN Holding, while the Debtor held the 55.9% interest in NJUN Holding.  In 2007, the Debtor formed NJUN-NJUN, LLC to serve as a member of NJUN Holding, LLC, which in turn was the managing member of NJUN, LLC and a member of NJUN Technologies, LLC.  The Debtor retained a 55% interest in NJUN-NJUN, purportedly giving him the majority interest in the NJUN system.  The balance of NJUN-NJUN in 2007 was held in equal share by Mr. Ringo and Mr. Abernathy.

*2008 - 2009*

In 2008 and 2009, the real estate market in Atlanta and around the country declined severely, and the country went into a major recession.  This recession impacted the NJUN Companies as it did any other company involved in products used in real estate development.  At the time of the recession, no sales of the NJUN system had occurred.  By the fall of 2008, NJUN, LLC was in receipt of demands for payment of patent fees.  During the latter part of 2008, NJUN, LLC, through Larry Bradford and others, began to obtain loans from third parties.  At least three outside parties loaned NJUN, LLC $300,000, which would need to be repaid.  By February 2009, NJUN, LLC received notice it would owe at least $7,800 in patent fees by the end of 2009.  In April 2009, the existing members of NJUN, LLC contemplated how best to move forward with the company.  During April and May 2009, the Debtor documented his discussions with Mr. Ringo, Mr. Limbach and Mr.'s Breedlove in a memo he titled "seeking direction".  In it, he explored ways forward with the company, recognizing that some participants were interested in being active while others were interested in a more passive role.  Debtor stated that Mr. Ringo expressed his interest in moving forward with the company only in a way that allowed him to be completely in control of all or some portion of the business.  This proposal was reiterated in "Oversight Board" minutes in the same time period.  Mr. Ringo testified he wanted complete control of the portion of the business in which he was involved because he did

not want to work with Mr. Bradford.    He first sought to assert some control beginning in July 2009.  Mr. Ringo incorporated NJUN One, LLC, and NJUN Holding, LLC allegedly assigned to NJUN One, LLC the exclusive rights to manufacture, promote, sell, install, and collect all monitoring and sales fees and conduct all business-related activities for NJUN systems for the entire state of Georgia.[3]

About the same time, Mr. Ringo began negotiating with Shechem Industries, Inc. ("Shechem") for Shechem's involvement in the NJUN system.    On December 22, 2009, Shechem and NJUN One, LLC entered into a contract that granted Shechem rights to install NJUN systems throughout the State of Georgia for a fee of $600,000.  The payment of this fee actually began in September 2009.  Shechem never met with the Debtor or talked directly with him.    Rather, Mr. Ringo represented to Shechem that he spoke for Rocky White.    In the meantime, the loans from the three outside investors had not been repaid.    As a result, the company began entering into forbearance agreements and repayment arrangements with the three outside investors in late 2009.  As no other existing member of NJUN, LLC appeared to be in a position to contribute additional funds, the Debtor and Mr. Ringo moved towards Mr. Ringo asserting full control over the Debtor's interest in NJUN, LLC.    Notwithstanding this shift in member control of the company, the Debtor, with Larry Bradford, remained in control of the technical aspects of the company, including the design and modification of the product. Additionally, Larry Bradford remained heavily involved in the accounting and bookkeeping of the company in 2009.  No sales of the NJUN system occurred in 2009.

*2010*

In the spring of 2010, several events occurred.    As of April 27, 2010, a second amendment to the operating agreement for NJUN Holding, LLC was executed which delegated

---

[3] The legal ability of the Debtor on behalf of NJUN Holding to assign the rights to Georgia to NJUN One is disputed by Plaintiffs and is subject to litigation in another case.  Nothing herein is meant to adjudicate that issue.

to Mr. Ringo a "specified territory" consisting of Florida, Alabama, Tennessee, South Carolina, North Carolina and Virginia.  Mr. Ringo was given the same rights and powers within those six states as NJUN Holding, LLC held.  Mr. Ringo was to form a new company with which to govern and manage the territory.  The agreement provided that, although the new company was autonomous, it was not "independent" of NJUN Holding, LLC and was to be in a "mutual working relationship" with NJUN Holding in order to advance the interests of NJUN Holding. Apparently in pursuit of this delegation of authority in specified territories, Mr. Ringo set up NJUN Southeast, LLC.

By the spring of 2010, Shechem had made its last payment under the agreement with NJUN One (for the State of Georgia).  However, the NJUN system was not yet ready for market. The NJUN system needed additional development, and regulatory approval still needed to be obtained.  Further negotiations then ensued between Mr. Ringo, Shechem and NJUN Southeast. On June 3, 2010, Shechem executed a second agreement with NJUN Southeast and Mr. Ringo that provided Shechem with the right to supply products associated with the NJUN system throughout the six states which were assigned to Mr. Ringo in the second amendment to the operating agreement ("Six States Agreement").   Again, all negotiations occurred between Shechem and Mr. Ringo, and Shechem did not communicate with the Debtor.  In exchange for the right to supply products to these six states, Shechem was to pay NJUN Southeast a territory fee of $30 million.  The territory fee would be paid in part in monthly installments.  For the first year, the payments were at least $50,000 per month and thereafter the payments were based on monthly sales.

As of June 1, 2010, the Debtor resigned as managing member of NJUN Holding, LLC and appointed Mr. Ringo as managing member.  On October 22, 2010, Mr. Ringo and the Debtor executed an amendment to the NJUN-NJUN operating agreement that resulted in the transfer of

the Debtor's remaining interest in NJUN-NJUN to Mr. Ringo.  At around the same time,

discussions were ongoing between Mr. Ringo and representatives of Shechem regarding a

potential sale of stock in NJUN Holding to Shechem.  One proposal was for Shechem to acquire

a 5% stake in NJUN Holding for $3.5 million, equating to $700,000 per share.  The draft term

sheet regarding this purchase also contemplated modifications to the Six States Agreement.  No

such transaction was ever consummated, however; Shechem never purchased any interest in any

of the NJUN entities; and the Six States Agreement was not modified.  On the same date the

Debtor executed the amendment to the NJUN-NJUN agreement transferring all of his interest to

Mr. Ringo, the Debtor apparently executed a document called "In Case of an Emergency".  No

copy was presented.  Later, only the Debtor signed an undated document entitled "Rescinding

the 'In Case of Emergency' Clause".  It states as follows:

> On October 22, 2010, the Managing Member of NJUN, LLC created a
> document entitled "In Case of an Emergency" which stated in its entirety the
> following:
>> 'Kevin Ringo and Rocky White created NJUN NJUN, LLC
>> Operating Agreement on October 22, 2010 in order to expedite a
>> sale of NJUN, LLC shares to Joseph Forrester.  Although the
>> document was completed that would enable this to take place, it
>> was only completed to the extent that it enabled the attorneys the
>> ability to complete the above-said transaction.  There are still
>> details between White and Ringo that need to be worked out that
>> would make NJUN NJUN's Operating Agreement complete
>> between them.  There is no ambiguity between the two of them on
>> this matter.'
>
> With this previous document being understood, the purpose of this
> document is to establish that the details between White and Ringo mentioned in
> the above stated document have now been worked out.

Mr. Ringo and the Debtor testified that the original "In Case of Emergency" clause was

to deal with a situation where one of them was deceased or incapacitated.  Plaintiffs suggested

that the "In Case of Emergency" clause and the rescission thereof was a side deal of some sort.

Nevertheless, the Court finds that a sale of stock to Shechem never occurred, and no evidence

was presented to contradict the Debtor's and Mr. Ringo's explanation of the "In Case of Emergency" clause.

*2011 - 2013*

With the documentation of the various transactions complete, the NJUN systems began to be installed. In 2011 and 2012, NJUN wastewater systems were installed at the Pioneer Lodge and the Capitol Lodge in North Dakota. The price of the system installed at the Pioneer Lodge was approximately $90,000, while the system installed at the Capitol Lodge sold for approximately $1.2 million. The first dollars were received on these jobs in October 2011. Each of these lodges was a "man camp" erected in response to the demand for housing created by the oil drilling in North Dakota. NJUN's theory was that not only could it provide the wastewater treatment facility, it could sell the cleaned water back to oil companies for use in the drilling process. Problems with the wastewater treatment system arose during the installation, however. The Debtor and his brothers Rudy and Robbie spent many months in North Dakota working on the installation. Around the end of 2011, Robbie returned to Georgia. Rudy and the Debtor stayed in North Dakota through much of 2012. The Debtor directed virtually all technical aspects of the installation and troubleshooting of the wastewater system in North Dakota.

At some point in 2011 or 2012, the Debtor and Mr. Ringo determined the problems that arose with the installation in North Dakota were related to Larry Bradford's work on the controller portion of the system. Mr. Ringo's relationship with Larry Bradford continued to deteriorate and Mr. Ringo ceased making payments to Mr. Bradford. In April 2012, Robbie sued the Debtor in Gwinnett County for failure to repay certain loans allegedly made to the Debtor for the business over numerous years. Robbie obtained a default judgment against the Debtor on June 14, 2012, in the amount of $162,074.72. Thereafter, Robbie garnished the Debtor's bank account.

Meanwhile, Shechem continued to make the minimum payments required under the Six States Agreement. By 2013, however, no products had been sold under the Six States Agreement. On June 14, 2013, Shechem entered into a Patent License Agreement ("PLA") with NJUN, LLC, NJUN Holding, LLC, NJUN One, NJUN Southeast and Mr. Ringo. Under the PLA, Shechem was granted the right to sell and use licensed NJUN products in the same territory laid out in the Six States Agreement. The PLA stated expressly it was intended to supersede the Six States Agreement. The PLA also required Shechem to pay a percentage of its net revenue as royalties to NJUN Southeast. No sales of the NJUN technology were ever made by Shechem under any of the agreements, despite the fact Shechem paid NJUN One and NJUN Southeast well over $1 million. Shechem continues in business making modifications to the wastewater technology and testing its version of the wastewater technology. NJUN One provided a wastewater treatment system to a church in Bethlehem, Georgia, but that work was performed by NJUN One, and not by Shechem or NJUN, LLC. In 2013, Rudy and his son continued periodic work in North Dakota and the Debtor went to North Dakota for a week or so in early 2013.

*Flow of Cash to the Debtor*

From 2005 until 2010, the Debtor appears to have acted as manager of NJUN, LLC, since he was the managing member of NJUN Holding, LLC which was the managing member of NJUN, LLC. In practice, it appears the Debtor and Larry Bradford handled the day-to-day operation of NJUN, LLC. Until June 2012, the Debtor received funds from NJUN, LLC, but the amount and nature of the funds varied. The Court received into evidence copies of NJUN, LLC's Brand Bank account statements for the period January 31, 2004 through December 31, 2008 and a "QuickBooks" printout of NJUN, LLC disbursements for periods January 1, 2010 through January 31, 2013 and December 26, 2013 through August 29, 2014. The Court received

no evidence of NJUN's disbursements for the period January 1, 2009 through December 31, 2009 or for the period January 31, 2013 through December 26, 2013. Prior to Mr. Ringo's substantial involvement in NJUN, Larry Bradford maintained the financial records of NJUN, LLC. When Mr. Ringo became significantly involved, he maintained the financial records of NJUN, LLC in QuickBooks. It is unclear whether there are some periods of time where overlapping records were maintained.

Based on the Court's review of the evidence, it finds that the Debtor received the following funds from NJUN, LLC:

| | |
|---|---|
| 2004 | $ -0- |
| 2005 | $33,000 |
| 2006 | $ -0- |
| 2007 | $ -0- |
| 2008 | $61,000 |
| 2009 | $ -0-[4] |
| 2010 | $146,015 |
| 2011 | $187,300 |
| 2012 | $69,800 |
| 2013 | $ -0-[5] |
| 2014 | $2,000 |

Beginning with the NJUN "QuickBooks" records of February 1, 2010, disbursements to Mr. Ringo are frequently identified as "Partner 1 Draw", while disbursements to the Debtor are identified as "Partner 2 Draw", and disbursements to Larry Bradford are identified as "Partner 3 Draw". The disbursements to the Debtor, Mr. Ringo and Larry Bradford are generally in even-numbered amounts, but the amounts vary. The dates of the disbursements also vary. It appears there was no set compensation schedule for the Debtor, Mr. Ringo or Larry Bradford; rather, the Debtor, Mr. Ringo and Mr. Bradford received funds as and when funds were available or needed

---

[4] While the Court received no evidence of NJUN's disbursements, it has reviewed the bank account records of the Debtor for this time period. There are numerous deposits into the Debtor's bank accounts; the source of the deposits, however, is unknown. Some of the deposits state clearly they are from a savings account, but there is no evidence of the savings account records.
[5] While the 2013 NJUN bank records were not submitted, Mr. Ringo and the Debtor testified he received no funds from NJUN in 2013.

by them.  The last "regular" payment to the Debtor from NJUN, LLC was June 28, 2012, and is labeled as "Contract Labor/LAW".  The payment of $2,000 to the Debtor on May 18, 2014 is labeled "For Work on Patents".  Larry Bradford's last "Partner 3 Draw" was April 17, 2012.  Mr. Ringo testified Mr. Bradford was terminated because he could not fulfill his duties.  The other members of NJUN, LLC – Tom Limbach, Ed Breedlove and Keith Breedlove – do not appear to have received "draws" or any other transfers from NJUN, LLC according to the records maintained by Mr. Ringo beginning in 2010.  Of the three, only Mr. Limbach appears to have received any funds in the 2004-2008 time period.

When asked why payments to the Debtor ceased in June 2012, Mr. Ringo stated that the North Dakota job was complete and the company was short on cash.  The Shechem payments were completed in 2011.  Nevertheless, Mr. Ringo continued to receive a Partner 1 draw throughout the remainder of 2012 and other contract labor and expenses were paid.  In an e-mail dated August 8, 2013, from Mr. Ringo to Mr. Limbach in the context of explaining to Mr. Limbach what he might see in reviewing an attached profit and loss report or check registers, Mr. Ringo stated, "Just for the record, we stopped Larry in 2012 and Rocky got the judgment filed against him in 2012."  Mr. Ringo explained further, "You will see a number of personal uses of my company debit card.  This happened in times where we were not getting paid and I had no choice but to use it.  This was not uncommon for any of us that were working to keep it all going."

The Debtor did not have any regular employment after his work with NJUN ended in the summer of 2012.  Instead, he took odd jobs to support himself and had help from family and friends in the form of cash.  No records exist to document how much and when various funds were received by the Debtor.  The only other source of income disclosed by the Debtor was from the sale of a truck in 2012 where he split the proceeds with his brother Rudy, each of them

receiving approximately $10,000.  The Debtor testified that his income according to his 2010 tax return was $34,000; 2011 tax return was $48,164; 2012 was $4,800; and 2013 and 2014 were approximately $11,000.  The difference between payments from NJUN and reported income is attributed in large part to reimbursements from NJUN for expenses advanced and materials purchased by the Debtor on NJUN's behalf.

*Bank Accounts*

The Debtor maintained a personal checking account at Bank of America at least for the period December 25, 2008 through June 2012.  The Court received no evidence as to exactly when the Debtor ceased maintaining a personal bank account, but at some point in the summer of 2012, Robbie White garnished the Debtor's bank account after which the Debtor stopped using a bank account.

Without a bank account, the Debtor used cash to pay his bills and when necessary he used his brother Rudy's bank account.  Rudy's bank accounts at Bank of America and Wells Fargo for the periods of August 2013 until August 2014 were admitted into evidence.  The testimony and the Court's review of the bank accounts reflect that the Debtor's car insurance with Progressive Insurance Company was paid from Rudy's bank account.  The Debtor would provide money to his brother with which to make the payment.  Similarly, in the year before the filing of the bankruptcy petition, the Debtor's cell phone bill was paid from Rudy's bank account.  The cell phone bill included six lines, only one of which was the Debtor's.  The remaining lines were used by Rudy, his sons, and the mother of Rudy, Robbie and the Debtor.  The Debtor would provide funds to Rudy to compensate him for the Debtor's portion of the bill.  During the year prior to the filing of the bankruptcy petition, the Debtor had a title pawn with TitleMax, which had originated some years earlier.  Rudy also had separate title pawns with TitleMax.  A number of payments to TitleMax were made from Rudy's bank account.  Upon

review of the evidence provided by the representative of TitleMax and Rudy's bank statements, the Court concludes that only four of the payments made to TitleMax on the Debtor's account in the year prior to the filing of the petition came from Rudy's bank account. The remaining TitleMax payments from Rudy's bank account were on account of Rudy's TitleMax accounts. Rudy testified that he provided debit cards for his bank accounts to his sons, to his mother, and to the Debtor to be used if needed. The Debtor and Rudy agreed that the Debtor had deposited $6,680 into Rudy's Bank of America account during the year prior to the filing of the petition, and $1,900 into Rudy's Wells Fargo account in the year prior to the filing of the petition. Finally, the Debtor lives and has lived for quite some time in the home owned by his mother. Consequently, no household expenses appear to have been paid by the Debtor out of his personal account while it existed or out of Rudy's bank accounts.

Beginning in November 2011, Rudy White received funds from the NJUN, LLC account. Rudy was not a full-time employee of NJUN. In addition to his periodic work with NJUN, he did odd jobs and made repairs on houses. In 2011, he received only $3,000 from NJUN. Although the Debtor ceased receiving funds from NJUN after June 2012, Rudy continued to receive funds from NJUN as he provided services to NJUN. Rudy's two sons also worked periodically for NJUN, but did not have bank accounts. Rudy would receive payments from NJUN on behalf of his sons and then provide cash to his sons. From the evidence provided, the Court finds that Rudy received $49,611.14 in 2012 (at least $12,500 of which is labeled as "Reimbursement" or "Payment to Others"); $5,400 in 2013; and $50,799.35 in 2014 (at least $4,300 of which is labeled as "Reimbursement" or "Payment to Others"). Like his brother, Rudy paid a number of expenses on behalf of NJUN out of his personal bank account, so at least some portion of the funds received by Rudy were for reimbursement of expenses. The disbursements from NJUN to Rudy were mostly denominated "Contract Labor". Some of the disbursements

were noted to be "Split".  In each instance, though, the Court could identify the full amount of the payment being deposited into Rudy White's bank account.  The nature and amount of payments received by Rudy White in 2012 did not vary significantly.  The amount and nature of the payments to Rudy White were based on the services he provided to NJUN.

The Debtor lived in his mother's home all his life and was her primary caretaker for much of that time.  In December 2013, the 90-year-old mother of the Debtor and Rudy (and Robbie) fell.  In order to permit her to stay at home, the Debtor and his brother Rudy undertook numerous renovations of her house.  The mother received insurance proceeds as a result of the fall, which were deposited in Rudy's bank account.  Numerous of the withdrawals from Rudy's bank accounts were related to his mother's care and the repair and renovation of her house.  After her fall, taking care of his mother and renovating her home became virtually a full-time job for the Debtor until she moved in with Rudy and his family.

_House Flipping_

Rudy assisted the parents of Andrena Alexandre with home repairs.  Ms. Alexandre attended the same place of worship as the Debtor.[6]  Ms. Alexandre was aware that the Debtor and Rudy wanted to get involved in the house-flipping business.  Ms. Alexandre's parents had rental properties.  In late 2013 or very early 2014, Ms. Alexandre was reviewing the Housing & Urban Development ("HUD") website for available properties and saw a house for sale on Rock Chapel Road which was close to one of her parents' rentals.  The house was very inexpensive, so she placed a bid for the house on the HUD website.  She did not expect to win the bid, but had in the back of her mind that, if the bid was successful, she would transfer the bid to Rudy so he could get started in this house-flipping business.  To her surprise, she was notified that she won

---

[6] Ms. Alexandre and the Debtor were married in January 2016.

the bid and needed to put a $500 deposit down immediately.  She did so with a lawyer named Mr. Kaiser.  She anticipated the closing would occur very soon.

In anticipation of the closing, Rudy White transferred $28,000 to Ms. Alexandre on January 8, 2014.  This money was sufficient to cover the entire purchase price.  The closing was delayed, and Rudy White had a need for some of the money in order to make repairs on his mother's home.  Therefore, on January 22, 2014, and January 27, 2014, Ms. Alexandre returned a total of $7,000 to Rudy White.  When the closing was rescheduled, Rudy White gave Ms. Alexandre $6,000 on February 5, 2014 in order to complete the closing on the house.  (He in effect returned $6,000 of the $7,000 she had repaid him.)  On February 6, 2014, she wired $25,837.59 to the law firm that was closing the purchase of the home on Rock Chapel Road.

The money which Rudy White transferred to Ms. Alexandre came from NJUN, LLC. Rudy obtained $30,000 from NJUN, LLC on January 8, 2014 and another $10,000 from NJUN, LLC on February 5, 2014.  On March 1, 2014, in a document entitled "Loan Agreement", Rudy White and Mr. Ringo documented that the $40,000 obtained by Rudy was a loan.  No repayment terms were included in the Loan Agreement.  Mr. Ringo testified that Rudy would pay it back when and if he could.  This $40,000 provided by NJUN, LLC was the source for the $27,000 paid to Ms. Alexandre.

On February 7, 2014, HUD executed a deed to Ms. Alexandre for the property located at Rock Chapel Road.  Immediately thereafter, a deed was executed by Ms. Alexandre to Rudy White transferring the property to him.  Ms. Alexandre's understanding was that the transfer from HUD must be made to the party who made the successful bid.  Since she was the successful bidder, she must receive the property even though her intention all along was that the property be transferred to Rudy White.  No money of Ms. Alexandre's was used to purchase the house at

Rock Chapel Road.  All of the funds used to purchase the Rock Chapel property came from Rudy White.[7]

After the purchase of the home from HUD, Rudy and the Debtor discovered title defects. Nevertheless, later that year, Ulysses Reynolds, who also lived in the area, stopped at the house while Ms. Alexandre was mowing the lawn.  He was interested in buying the house and inquired with whom he should speak.  Ms. Alexandre stated that she provided him with Rudy White's phone number, although Mr. Reynolds is sure that he spoke with the Debtor.  The Court finds that Mr. Reynolds did speak with the Debtor regarding the purchase of the home and met with the Debtor at least once to review the documents.  In December 2014, the property at Rock Chapel Road was sold by Rudy White to Ulysses Reynolds.  The purchase was owner-financed. Mr. Reynolds makes monthly payments of $325 to Rudy White and those payments are deposited in Rudy White's accounts.

The Court finds the Debtor and Rudy were not in the house-flipping "business" as the only evidence at any attempt at house flipping was the purchase of the one property at Rock Chapel Road described above.  The evidence shows the Debtor has no legal entitlement to the Rock Chapel property.  His funds did not purchase the home, and his name was never in the chain of title.  The fact that he may have advised his brother in either the purchase or sale of the home or facilitated it does not make the property the Debtor's.  There was no evidence that Rudy ever repaid the loan from NJUN.

*State Court Proceedings*

After having received a default judgment against his brother in July 2012, Robbie White and Phyllis White filed another complaint against the Debtor in state court alleging fraud and breach of contract.  Robbie and Phyllis White filed a third complaint in state court on June 30,

---

[7] Whether the "loan" from NJUN, LLC to Rudy White was in fact any money of the Debtor's is discussed below.

2014, alleging the Debtor breached certain fiduciary duties, embezzled partnership funds, and fraudulently induced them to lend monies. The 2012 lawsuit was scheduled to go to trial in August 2014. Instead, the Debtor filed his petition under Chapter 7 of the United States Bankruptcy Code on August 5, 2014, with the assistance of counsel.

*Bankruptcy Schedules*

In his original Statement of Financial Affairs ("SOFA"), the Debtor made the following relevant statements:

(i)    He had income of only $5,000 in each of 2012 and 2013 resulting from odd jobs. The Debtor received no other income.

(ii)    The Debtor made no transfers within the requisite two-year period.

(iii)    The Debtor did not close any financial accounts within one year.

(iv)    The Debtor stated "none" in answer to Question No. 18 inquiring as to any entity in which the Debtor had been officer, director, partner or managing executive or held more than 5% controlling interest within six years of the date of the petition.

In his schedules, the Debtor only identified as assets an Audi worth an estimated $4,000 and on which TitleMax held a non-purchase-money security interest of $3,051 and clothes of $500. In his schedules, the Debtor stated he received approximately $715 per month from a combination of odd jobs and family and he used that money to pay for a cell phone, health and car insurance, and to make a car payment.

The Debtor's 341 meeting was held on September 8, 2014, where the Debtor reiterated, under oath, that all of the statements in the schedules were correct. In response to the Trustee's question, the Debtor initially responded that he had not sold or transferred anything of value in the last five years, but, without prompting, corrected the statement to reflect that he had "given" shares in certain companies to Mr. Ringo in 2009. The Debtor expressed his opinion that the stock was worthless and was transferred because he could not afford to make the payments on the patents. The Debtor responded consistently at the 341 meeting that he did not own an

interest in any of the NJUN Companies after October 2010. The Debtor disclosed that he sold a truck in 2012 to Carmax and that he had visited North Dakota once in 2013 and none in 2014.

After the 341 meeting, the Debtor amended his SOFA and schedules twice – on September 29, 2014 and on November 20, 2014. He added to his SOFA his income from 2011 and disclosed the sale of the car in 2012 that had been discussed at the 341 meeting. He also responded to Question No. 18 in the SOFA, disclosing a position or interest in NJUN Holding, LLC, NJUN-NJUN, LLC and NJUN, LLC. With respect to each of them, his response to beginning and ending dates was "current" or "to present". The response does not identify whether he held a position in those companies or an interest in those companies. The Debtor also amended his Schedule F to add Thelma Brownlee as an unsecured creditor.

It is Plaintiffs' contention that the Debtor's statements in his SOFA, schedules and testimony at the 341 meeting are false because he had income that was not disclosed, continued to hold an interest in the NJUN entities, and held an interest in a house on Rock Chapel Road.

## LAW

### *Legal Standard*

Plaintiffs contend the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4) and (a)(5).

Because one of the fundamental goals of the Bankruptcy Code is to provide a debtor with a fresh start, "[a] denial of a discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party." Eastern Diversified Distribs., Inc. v. Matus (In re Matus), 303 B.R. 660, 671 (Bankr. N.D. Ga. 2004) (citations omitted). "[T]he reasons for denying a discharge … must be real and substantial, not merely technical and conjectural." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994) (citations omitted). The burden of proving the

objection to discharge is generally on the plaintiff, Fed. R. Bankr. P. 4005, and the burden must

be carried by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279 (1991).

*Section 727(a)(2)*

 Section 727 of the Bankruptcy Code provides

 (a)  The court shall grant the debtor a discharge unless *(\*)* –

  … (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

   (A)  property of the debtor, within one year before the date of the filing of the petition; or

   (B)  property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).  Thus, to deny a debtor a discharge under this section, Plaintiffs must

show the Debtor transferred or removed or concealed his property, within the requisite time

period, and had the requisite intent to hinder, delay or defraud.  "Section 727(a)(2) is intended to

prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or

otherwise disposing of assets."  6 Collier on Bankruptcy ¶ 727.02[1] (Alan v. Resnik & Henry J.

Sommer eds., 16th ed. Supp. 2013).

 While "transfer" is not defined in Section 727, 11 U.S.C. § 101(54) defines transfer to

include,

  (D)  each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with –

  (i) property; or

  (ii) an interest in property.

Under this broad definition of transfer, even a disposition of possession, custody or control could

qualify as a transfer.  Removal, on the other hand, is "an actual or physical change in the position

or locality of property of the debtor resulting in a depletion of the debtor's estate."  6 Collier on

Bankruptcy ¶ 727.02[6][a] (16th ed. Supp. 2010).  Concealment includes physical hiding of the property, and "other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failing or refusing to disclose the information."  Id. ¶ 727.02[6][b] (citing San Jose v. McWilliams, 284 F.3d 785 (7th Cir. 2002)); Keeney v. Smith (In re Keeney), 227 F.3d 679, 684 (6th Cir. 2000); Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1293 n.1 (10th Cir. 1997).  Transfers made more than one year prior to the petition date may fall within Section 727(a)(2) if the debtor retained a concealed interest in the asset.  See R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 299 B.R. 253, 259 (B.A.P. 1st Cir. 1999); Rotella & Assoc. v. Bellassai (In re Bellassai), 451 B.R. 594, 602 (Bankr. S.D. Fla. 2011).  The concealment of the interest must occur within the year prior to the bankruptcy filing.

Finally, a creditor proceeding under Section 727(a)(2) must prove the debtor possessed an actual intent to hinder, delay or defraud creditors or the trustee when he transferred, concealed or removed his or the estate's property.  The Eleventh Circuit has made clear that a preferential transfer is not the type of transfer which will bar a discharge.  Miller, 39 F.3d at 307; see also Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936); Rutter v. Gen. Motors Acceptance Corp., 70 F.2d 479 (10th Cir. 1934); Ins. Office of America, Inc. v. Wall (In re Wall), 2008 WL 8792259 (Bankr. S.D. Ga. Mar. 31, 2008).  Constructive fraud is also insufficient.  Miller, 39 F.3d at 306.  Actual fraudulent intent, however, may be inferred from the circumstances surrounding the transfer or concealment.  Emmett Valley Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992).  The actions at issue should demonstrate "culpable intent", such that the actions are "blameworthy in an equitable sense."  Belmont Wine Exch., LLC v. Nascarella (In re Nascarella), 492 B.R. 914, 916 (Bankr. M.D. Fla. 2013) (citations omitted).

*Section 727(a)(3)*

To deny the Debtor a discharge under Section 727(a)(3), the Court must conclude

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep
> or preserve any recorded information, including books, documents, records,
> and papers, from which the debtor's financial condition or business
> transactions might be ascertained, unless such act or failure to act was
> justified under all the circumstances of the case;

11 U.S.C. § 727(a)(3).

"The purpose of § 727(a)(3) is to give creditors, the trustee and the bankruptcy court complete and accurate information concerning the debtor's affairs and to ensure that dependable information is provided so that the debtor's financial history may be traced." Hylan Debt Fund, LLC – Portfolio Series 18 v. Nestor (In re Nestor), 546 B.R. 482, 486 (Bankr. N.D. Ga. 2016) (citing Harrington v. Simmons (In re Simmons), 525 B.R. 543, 547 (1st Cir. BAP 2015)); In re Juzwiak, 89 F.3d 424, 427-28 (7th Cir. 1996) (citations omitted). Section 727(a)(3) has been consistently read to impose an affirmative obligation on defendants to keep records appropriate to their circumstances. Bank of Amer. v. Seligman (In re Seligman), 478 B.R. 497, 504 (Bankr. N.D. Ga. 2012) (citing Hughes v. Lieberman (In re Hughes), 873 F.2d 262 (11th Cir. 1989)). The debtor's intent is not an element of a denial of discharge under Section 727(a)(3). Trauner v. Burrowes (In re Burrowes), 2011 WL 5035975, at *2 (Bankr. N.D. Ga. Oct. 13, 2011). But the requirement under Section 727(a)(3) that a debtor maintain recorded information from which debtor's financial condition or business transactions might be ascertained is not absolute. A debtor may receive a discharge if the failure to keep records is "justified under all the circumstances." Milam v. Wilson (In the Matter of Wilson), 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983).

Like the other subsections of Section 727, the plaintiff in an action under Section 727(a)(3) bears the burden of proving that the debtor is not entitled to a discharge. See Fed. R. Bankr. P. 4005. But once the plaintiff has demonstrated its case the burden shifts to the debtor to

explain why the records were not kept.  Seligman, 478 B.R. at 804 (citing Phillips v. Nipper (In re Nipper), 186 B.R. 284, 289 (Bankr. M.D. Fla. 1995)).

Exactly what is required to meet the plaintiff's burden of proof has been debated by the courts.  For example, in Meridian Bank v. Alten, 958 F.2d 1226 (3rd Cir. 1992), the court spoke in terms of whether the debtor's failure to maintain and preserve records made it "impossible" to ascertain the debtor's financial condition and material business transactions.  Id. at 1232.  See also Butler v. Liu (In re Liu), 288 B.R. 155, 161 (Bankr. N.D. Ga. 2002) (quoting Barman v. Barman (In re Barman), 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000)).  On the other hand, the bankruptcy court in Strzesynski v. Devaul (In re Devaul), 318 B.R. 824 (Bankr. N.D. Ohio 2004) required the moving creditor to "first offer evidence of the general nature of debtor's business or personal financial position (e.g., consumer, business relationships and interest, general nature of business interests and sources of income) and the types of transactions about which recorded information is sought … Second, the plaintiff must present evidence identifying for the court … what recorded information it alleges has been … not kept or preserved by a debtor. … Third, the plaintiff must show how the missing recorded information 'might' enable a particular debtor's actual financial condition or business transactions to be ascertained under the circumstances of the case", id. at 833, and in the relevant time period.  Burrowes, 2011 WL 5035975, at *2. "Records need not be kept in any special manner, nor is there any rigid standard of perfection in recordkeeping mandated by section 727(a)(3). On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs."  Juzwiak, 89 F.3d at 427–28.  After this prima facie case is made, the burden shifts to the debtor to show that the failure to keep such documents and records is justified.  "The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances."  Wilson, 33 B.R. at 692.  Justification

takes into account all circumstances such as the debtor's level of sophistication, level of education, types of assets and liabilities, and complexity of the debtor's business affairs. Id. (citing Goff v. The Russell Co. (In re Goff), 495 F.2d 199 (5th Cir. 1974)); Fisher v. Quay (In re Quay), 2005 WL 6488242, at *10 (Bankr. N.D. Ga. March 29, 2005) (citing US v. Trogdon (In re Trogdon), 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)). The courts have consistently held that the "standard for the disclosure of records for a sophisticated debtor is higher than that of an unsophisticated debtor." Gebhardt v. Gartner (In re Gartner), 326 B.R. 357, 375 (Bankr. S.D. Tex. 2005). The court has "broad discretion in determining the sufficiency of the records provided". Neary v. Hughes (In re Hughes), 353 B.R. 486, 500 (Bankr. N.D. Tex. 2006).

*Section 727(a)(4)*

To deny a debtor a discharge under Section 727(a)(4)(A), a plaintiff must show "… the debtor knowingly and fraudulently, in or in connection with the case – (a) made a false oath or account; …". 11 U.S.C. § 727(a)(4)(A). Under this section, a plaintiff must show there was a false oath, that it was material, and that it was made knowingly and fraudulently. A misrepresentation is material if it bears a relationship to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property." Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) (cites omitted). Detriment to creditors need not be shown. Id. Furthermore, the debtor may not defend himself by claiming the assets omitted were worthless. Id. "Creditors are entitled to judge for themselves what will benefit, and what will prejudice them." Id. While the definition of materiality is broad, it is not without limits as the purpose of the requirement the debtor make disclosures is to allow the trustee or creditors to investigate the debtor's affairs and recover any assets without a "costly investigation". Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999). So if the omission would not assist or impede the debtor or

creditors in this endeavor, it is not material.  Id.; see also Cadle Co. v. Pratt (In re Pratt), 411 F.3d 561, 568 (5th Cir. 2005) (failure of debtor to list his position as trustee of trust for his children was not material because the knowledge would not assist the debtor's creditors); Spencer v. Blanchard (In re Blanchard), 201 B.R. 108, 130 (Bankr. E.D. Pa. 1996) (undervaluing assets that would have been exempt was not material); Manning v. Watkins (In re Watkins), 474 B.R. 625, 655 (Bankr. N.D. Ind. 2012); aff'd sub nom; Manning v. Watkins, 2013 WL 3989412 (N.D. Ind., July 21, 2013) (failure to disclose interest in corporations not material to administration of the estate); Ivory v. Barbe (In re Barbe), 466 B.R. 737, 748 (Bankr. W.D. Pa. 2012) (failure to disclose dismantled stage immaterial because had no value).

Finally, a plaintiff must show that the omission or misstatement was made knowingly and with intent to deceive.  Again, a plaintiff must demonstrate actual common, not constructive, fraud, Wines v. Wines (In re Wines), 997 F.2d 852, 856 (11th Cir. 1993), but actual intent may be inferred from circumstantial evidence.  Ingersoll v. Kriseman (In re Ingersoll), 124 B.R. 116, 123 (M.D. Fla. 1991).  Furthermore, "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727".  Cadle Co. v. Taras (In re Taras), 2005 WL 6487202 at *4 (Bankr. N.D. Ga. Aug. 19, 2005) (citation omitted).  A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of intent to deceive.  Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992).  However, the discharge may not be denied when the untruth was the result of a mistake or inadvertence.  Id.  Further, while the omission of worthless assets may be material, the value of the asset omitted may be evidence of the debtor's intent, or lack thereof, to deceive.  Garcia v. Coombs (In re Coombs), 193 B.R. 557, 565-66 (Bankr. S.D. Cal. 1996).

The Court may deny a discharge under Section 727(a)(4)(D) if the debtor has knowingly and fraudulently withheld records or information from the trustee.  For this section to apply,

though, the plaintiff must present evidence that the trustee requested the applicable information. Grant v. Sadler (In re Sadler), 282 B.R. 254, 264 (Bankr. M.D. Fla. 2002), Young v Young (In re Young), 346 B.R. 597, 615 (Bankr. E.D. N.Y. 2006).

*Section 727(a)(5)*

The Court may deny the Debtor a discharge under Section 727(a)(5) if

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5).

In an action under 11 U.S.C. § 727(a)(5), the objecting creditor has the initial burden of proof and must demonstrate: "(1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets." Olympic Coast Inv., Inc. v. Wright (In re Wright), 364 B.R. 51, 74 (Bankr. D. Mont. 2007); Hawley v. Cement Industries, Inc. (In re Hawley), 51 F.3d 246, 249 (11th Cir. 1995). "A focus on the two years prior to the bankruptcy filing is common … [but] [i]nquiries beyond the two-year period may be warranted." Structured Asset Services, L.L.C. v. Self (In re Self), 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005). Once the party objecting to the discharge establishes the basis for its objection, the burden then shifts to the debtor "to explain satisfactorily the loss." Chalik. But the "lost" assets must be estate assets.

"The question of whether a debtor satisfactorily explains a loss of assets is a question of fact." Chalik, 748 F.2d at 619. For an explanation to be unsatisfactory, the court does not have to find that a debtor is lying. In re D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996). Under Section 727(a)(5), "[v]ague and indefinite explanations of losses that are based upon estimates

uncorroborated by documentation are unsatisfactory." <u>Chalik</u>, 748 F.2d at 619. "To be satisfactory, an explanation must convince the judge." <u>Id</u>.; <u>see e.g.</u>, <u>Reed v. First Texas Savings Ass'n, Inc. (In re Reed)</u>, 700 F.2d 986, 993 (5th Cir. 1983) (debtor's explanation that $19,586 was consumed by business and household expenses and gambling debts was unsatisfactory). "Courts are not concerned with the wisdom of a debtor's disposition of assets but, instead, focus on the truth, detail, and completeness of the debtor's explanation of the loss." <u>Self</u>, 325 B.R. at 250 (cites omitted). "Section 727(a)(5) requires that there be a satisfactory explanation of the loss of an asset, but does not require that the explanation be meritorious. … The Court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper". <u>Great American Ins. Co. v. Nye (In re Nye)</u>, 64 B.R. 759, 762 (Bankr. E.D. N.C. 1986); <u>Bailey v. Whitehead (In re Whitehead)</u> 483 B.R. 902, 910 (Bankr. E.D. Ark. 2012).

Plaintiffs seek to deny the Debtor's discharge based on the following contentions:

1.      The Debtor did not actually sell his interest in NJUN. He concealed that interest and made a false oath about it. He failed to satisfactorily explain the loss of his business interest.

2.      The Debtor's statement that he transferred his interest in NJUN to Mr. Ringo because NJUN was without sufficient funds to operate is untrue.

3.      The Debtor continued to receive income from NJUN after June 2012. He concealed the additional income and made a false oath in his SOFA and at his 341 hearing as to the amount of his income and failed to satisfactorily explain his loss of income.

4.      The Debtor obtained income which is not disclosed in the SOFA. The income took the form of cash from friends and family or advances from a title pawn. The Debtor concealed the additional income and made a false oath about it.

5.      The Debtor held an interest in a house-flipping business with his brother and in the house located on Rock Chapel Road.  His failure to disclose the interest is concealment and a false oath on his schedules.

6.      The Debtor ceased using a bank account in the summer of 2012 and did not maintain records sufficient for the Court and the Trustee to determine his financial condition and withheld records and information from the Trustee.

## NJUN OWNERSHIP INTEREST

Plaintiffs contend the Debtor owns an interest in the NJUN Companies which has been concealed or, if lost, its loss has not been satisfactorily explained.  Plaintiffs also contend Debtor has made false oaths about its disposition.  For these actions, Plaintiffs seek denial of the Debtor's discharge under Sections 727(a)(2), (a)(4) and (a)(5).

The Debtor contends that, in 2009 or 2010[8], he sold his interest in the NJUN Companies to Mr. Ringo.  The Debtor states the transfer was made because none of the other "partners" in the NJUN Companies was in a position or willing to invest additional money in the venture.  Mr. Ringo was prepared to make such an investment but only if he had complete control of at least a portion of the business.  Plaintiffs argue that the assignment of the Debtor's interest to Mr. Ringo is just a ruse.  They point to the "In Case of Emergency" document, Debtor's continued activity with the NJUN products after the date of the alleged transfer, and the payments made to the Debtor which are labeled "Partner Draw" as evidence of the ruse.

In late 2008 and early 2009, the NJUN Companies needed money.  Larry Bradford solicited at least $300,000 from at least three different parties as investments in the business.  In April and May 2009, the Debtor sought direction from the other participants in the NJUN Companies.   The business was struggling at this point, and the Debtor was attempting to

---

[8] The precise date of the transfer is contested by the parties and the Court makes no finding herein as to the date of the transfer.

determine if all of the interested parties could move forward on some basis. In the "seeking direction" memo (Plaintiffs' Ex. 75), the Debtor references that "Kevin" would like to run an area of the business and perhaps other investors would like to operate a specific area as well. In minutes of an April 30, 2009 oversight board meeting (Plaintiffs' Ex. 77), Mr. Ringo's desire to run an area of the business was reiterated. After considering the testimony of the Debtor and Mr. Ringo, and the demeanor of the witnesses, the Court finds credible the Debtor's testimony that Mr. Ringo would only contribute additional funds to the business if he had complete control, at least of the area in which he was to be involved. Mr. Ringo asserted operational control over sales in Georgia in 2009 and asserted financial control over the NJUN Companies beginning January 1, 2010 when the only bank records of expenditures of the NJUN Companies are the QuickBooks which he and his company maintained. On October 22, 2010, in furtherance of this plan, the Debtor and Mr. Ringo executed an amendment to the NJUN NJUN operating agreement that resulted in the transfer of the Debtor's remaining interest in the NJUN Companies to Mr. Ringo. Thus, on its face, the Debtor transferred his interest in the NJUN Companies at least by October 2010, well before the relevant Section 727(a)(2) period.

But, Plaintiffs claim the Debtor held a concealed interest in the companies. They contend he remained "in control" after this alleged transfer since he directed meetings regarding the installation and modification of the product, and appeared to call all the shots, particularly with respect to installation. The evidence demonstrates that the Debtor remained primarily responsible for the development and installation of the product in North Dakota, but that alone is not evidence the Debtor retained an ownership interest in the NJUN Companies. The Debtor was one of the patent holders of the product and was one of the primary inventors of the product, so it only makes sense that he would continue to be involved in the research, development and implementation of the product itself.

Plaintiffs argue that the "In Case of Emergency" document demonstrates there was a side deal between the Debtor and Mr. Ringo. The original "In Case of an Emergency" document was never submitted to the Court; only the termination of the "In Case of an Emergency" document was submitted and it was only signed by the Debtor. The "In Case of an Emergency" document appears to have been executed at about the same time Mr. Ringo was negotiating with Shechem to purchase an interest in the NJUN Companies. It is undisputed that Shechem never dealt with the Debtor and had no desire to deal with the Debtor. Shechem's understanding was that the Debtor was the person responsible for the product, but not for the company. Both Mr. Ringo and the Debtor testified the emergency they were contemplating was what would happen if either of them died or became incapacitated. The Court finds that, even if there was some intended side arrangement should the sale of stock to Shechem be consummated, Shechem never purchased an interest in the NJUN Companies, and Plaintiffs have presented no evidence that the transfer of the NJUN interest from the Debtor to Mr. Ringo was ever rescinded officially or unofficially.

Finally, Plaintiffs argue the Debtor's continued interest in the NJUN Companies is evidenced by the reference in QuickBooks to "Partner Draw" when the Debtor received payments from NJUN. The Court agrees this reference suggests the Debtor is a partner. This evidence alone, however, is insufficient to meet Plaintiffs' burden of proof. Mr. Ringo's daughter testified she made the entries in QuickBooks. She did not base her entry on any legal documents. Moreover, not all alleged "partners" received a draw or distribution. There was no evidence the Breedloves ever received a distribution and Mr. Limbach did not receive a distribution after 2008. This suggests to the court that the payments to the Debtor, Mr. Ringo and Mr. Bradford were not made on account of any alleged ownership interest in the NJUN Companies but on account of the work they were doing for NJUN. Despite the entry in QuickBooks, the payments appear to be in the nature of compensation. The Court notes it did

not receive evidence one might expect if the Debtor held a concealed ownership interest in the NJUN Companies.  For example, there was no evidence of the NJUN Companies' corporate tax returns or K-1s distributed to its members.  The Debtor's tax returns were never submitted into evidence and the Court saw no evidence the Debtor claimed an ownership interest in the NJUN Companies in the relevant time period for tax purposes.

Based on the foregoing, the Court concludes Plaintiffs did not prove the Debtor transferred or concealed an interest in the NJUN Companies within one year prior to the filing of the bankruptcy petition.  In this analysis, it is important to keep in mind that Section 727(a)(2) requires the transfer or concealment to have occurred within one year of the filing of the petition – in this case August 5, 2013 through August 5, 2014.  The Court concludes the Debtor did transfer his interest to Mr. Ringo prior to the year preceding the filing of the petition but that in the year preceding the filing of the petition, he had no expectation any interest in the NJUN Companies would be returned to him.  Thus, he did not conceal an interest in the NJUN Companies within the year prior to the filing of the petition.  Within this year prior to the filing of the petition, the Debtor was not involved in the management of the NJUN Companies, and there is no evidence he held any ownership interest in the NJUN Companies.  No evidence was presented of any funds transferred to the Debtor by NJUN in 2013 and only $2,000 was transferred to the Debtor in 2014 for specific work related to patents.  The Court cannot conclude from this evidence that the Debtor retained an ownership interest in the NJUN Companies.  The Court therefore concludes Plaintiffs did not carry their burden of establishing that the Debtor transferred or concealed an interest in the NJUN Companies within the year prior to the filing of the bankruptcy petition in violation of 11 U.S.C. § 727(a)(2).

Similarly, because the Debtor did not hold an interest in the NJUN Companies at the time the petition was filed, his alleged failure to disclose an interest in the NJUN Companies is not a

false oath or account.  The Debtor's testimony at his 341 meeting regarding the transfer is also not false because the Court has concluded the Debtor transferred his interest in the NJUN Companies prior to the filing of the bankruptcy petition.  Although the Debtor did not initially disclose the transfer of the interest in the NJUN Companies in his schedules or SOFA or disclose that he had previously held an interest in the companies within six years prior to the filing of the petition, the Debtor volunteered this information at his 341 meeting and then promptly amended his schedules and SOFA.  Thus, there is no evidence that any omission by the Debtor with respect to the transfer of his interest in the NJUN Companies was knowing and fraudulent as required by 11 U.S.C. § 727(a)(4)(A).

Finally, Plaintiffs have not established a basis for denying the Debtor a discharge under 11 U.S.C. § 727(a)(5) for failing to explain satisfactorily the loss of his interest in the NJUN Companies.  The Debtor's explanation is clear, consistent, and documented.  Whether the disposition was wise or constitutes a fraudulent conveyance as alleged by the Trustee in a separate adversary proceeding, is not determinative of whether the Debtor is entitled to a discharge.  The explanation for the loss of his interest in the NJUN Companies is sufficient. Nye, 64 B.R. at 759.

## DEBTOR'S STATEMENTS REGARDING
## WHY HE TRANSFERRED HIS INTEREST IN NJUN

Plaintiffs allege the Debtor's statement at the 341 meeting that he transferred his interest in the NJUN Companies to Mr. Ringo because NJUN was without sufficient funds to operate is untrue.  Plaintiffs contend this statement constitutes a false oath pursuant to Section 727(a)(4).

As noted above, the evidence supports the Debtor's statement that the company was short of money in 2008 and 2009.  Mr. Bradford sought outside investors in late 2008.  The only funds that came into the company in 2009 and 2010 came as a result of Mr. Ringo's transactions with

Shechem.  Plaintiffs' real argument is that the stock transferred had value, contrary to the Debtor's testimony.  But whether the transfer was for sufficient consideration is at the heart of the adversary proceeding pending against Mr. Ringo.  The Court will not effectively rule on the heart of the related fraudulent conveyance action in the context of this Section 727 action.  The Court concludes for purposes of this Section 727 action that the Debtor believes the statement and any falsity in this statement was neither knowing nor fraudulent and is therefore not a basis for denying his discharge under Section 727.

### CONTINUED INCOME FROM NJUN

Next, Plaintiffs point out the Debtor allegedly received no further income from the NJUN Companies after his bank account was garnished by Robbie White.  Plaintiffs contend the income the Debtor would have otherwise received from NJUN was routed to the Debtor through his brother Rudy White and his failure to disclose or otherwise explain where that income went warrants denial of his discharge pursuant to Sections 727(a)(2), (a)(4) and (a)(5).  Plaintiffs' suspicion is not unfounded, but the Court concludes the suspicion has not been established by a preponderance of the evidence.

It is certainly convenient that NJUN ceased making payments to the Debtor when his bank account was garnished.  Mr. Ringo, in an e-mail to Tom Limbach, while describing the NJUN companies' financial condition said that Larry Bradford's payments ceased and the Debtor's bank account was garnished.  This e-mail suggests that payments by NJUN to the Debtor were ceased because his account was garnished.[9]  As with the alleged continuing interest in NJUN, the relevant time period for a Section 727(a)(2) analysis is not 2012 but the period August 2013 through August 2014.  The evidence presented shows that, during this period, the source of income to NJUN dried up.  Shechem had paid under all of its agreements and did not

---

[9] No evidence was submitted as to the amount of funds received on the garnishment.

make any payments to the NJUN Companies after 2011. The work in North Dakota was also largely completed by 2012 with only limited work in the nature of repairs occurring in 2013. The evidence shows that the Debtor's brother Rudy and Rudy's son worked in North Dakota in 2013 but only received $5,400, further supporting the conclusion that the overall work of the NJUN Companies in 2013 was limited. Finally, in December 2013 (within the year prior to the filing of the bankruptcy case) the Debtor's elderly mother fell. The Debtor stayed with her continually, caring for her and working to make her house handicap accessible. This supports the Debtor's statement that he was not employed fulltime. It also points out why the Debtor did not need money – he was living with his mother, who was receiving her own income, and caring for her which would allow him to minimize his own expenses.

Plaintiffs suggest the Debtor continued receiving money from the NJUN Companies through his brother Rudy. Rudy first received funds from the NJUN Companies in 2011 when he received only $3,000. In 2012, Rudy received $49,611.14, at least $12,500 of which is labeled as "reimbursement" or "payment to others". The Court finds Rudy's testimony credible that, in addition to payment for his own services, he received payments for the services of his sons and reimbursement for supplies which he purchased. If Plaintiffs' theory were correct that Rudy was receiving money for the Debtor, one would expect the amount paid to Rudy to increase after the last payment to the Debtor on June 28, 2012. The facts, however, do not bear that out. The payments to Rudy in 2012 are relatively even, with over $22,000 paid to Rudy before the Debtor's last payment and before the garnishment of the Debtor's bank account by Robbie, and about $27,000 paid to Rudy after the Debtor's account was garnished. Rudy only received $5,400 from NJUN in 2013. He received over $50,000 from NJUN in 2014, which both he and Mr. Ringo testified came as a result of his work installing a waste water system in Bethlehem, Georgia. No one contested that he performed those services. The Plaintiffs did not

establish by a preponderance of the evidence that the Debtor received additional income from NJUN by virtue of NJUN's payments to Rudy.

So, while a lack of income for the Debtor after 2012 may look suspicious, there are reasons why the Debtor did not have income in the year prior to the filing of the bankruptcy case. Plaintiffs have not proven their theory that Rudy White received income on behalf of the Debtor or that the Debtor had income from NJUN in the year prior to the filing of the bankruptcy case that was concealed or not reported in the SOFA, so his discharge is not barred by Section 727(a)(2).

Similarly, because Plaintiffs have not proved NJUN continued to pay the Debtor through his brother Rudy, the Court concludes the Debtor did not fail to disclose income from NJUN such that his schedules and SOFA are a false oath under Section 727(a)(4). The Court also concludes the Debtor has satisfactorily explained the lack of income after June 2012. He ceased working for NJUN. Thus, his discharge is not barred under Section 727(a)(5).

## CASH FROM FRIENDS AND FAMILY

Plaintiffs contend, and Debtor acknowledged, that he received money from family and friends and also from a title pawn on his car. Plaintiffs contend this cash is not adequately disclosed and therefore that the Debtor's discharge should be denied under Section 727(a)(4). The Debtor testified that after mid-2012, he received cash from family, miscellaneous jobs, and title loans, and received some money in the mail that he later discovered came from his now wife. Plaintiffs have not shown, however, the Debtor did not adequately disclose the amount and source of these funds.

SOFA Question No. 1 only asks for the amount of income the debtor has received "from employment, trade or profession or from operation of the debtor's business …". Funds received as gifts from family and friends and funds received as advances on a title pawn would not be

disclosed in response to this question.  On both Schedule I (Income) and the Means Test form, the Debtor identified that he received approximately $715 a month on a regular basis from family contributions and odd jobs.  This totals approximately $8,500 a year.  The Debtor also testified that his taxable income in 2012 was $4,800 and in 2013 was approximately $11,000. The Debtor and his brother Rudy both testified that the Debtor deposited approximately $8,500 into Rudy's accounts in the year prior to the filing of the bankruptcy petition in order to make payments on his car insurance and on his one-sixth portion of a cell phone bill.  On several occasions, the Debtor deposited money in Rudy's account in order to make a payment to TitleMax on his car.  The amount deposited in Rudy's account is consistent with the amount of the Debtor's disclosed income.

Moreover, no evidence was presented that suggested the Debtor received more than the amount disclosed in the Schedules and SOFA.  No evidence was presented that the Debtor spent more than the amount shown as income in his Schedules and SOFA.  No evidence was presented that the Debtor had other assets that would lead one to conclude the Debtor must have had access to additional money.  Plaintiffs therefore failed to prove the Debtor received additional income that was not disclosed in his SOFA or Schedules and therefore that he made a false oath.

### "HOUSE FLIPPING" BUSINESS

Next, Plaintiffs contend the Debtor was in the "house-flipping business" with his brother Rudy and that he held an ownership interest in a house on Rock Chapel Road.  Plaintiffs argue the Debtor made a false oath under Section 727(a)(4) by not disclosing his interest in the house and his income from the house-flipping business.  Plaintiffs' evidence in this regard is two-fold. First, Plaintiffs allege the $40,000 "loan" from NJUN to Rudy was actually made on behalf of the Debtor.  Second, Plaintiffs argue that because the purchaser of the home, Ulysses Reynolds, dealt with the Debtor in negotiating the purchase, the Debtor owns an interest in the house.  As

the Court has already found, the Debtor and Rudy were not in the house-flipping "business" as the only evidence at any attempt at house flipping was the one property at Rock Chapel Road which has been described. The evidence shows the Debtor has no interest in the house and never did. There is no evidence the Debtor's money in any way went into the house to give him an equitable interest in the house. The loan from NJUN was paid directly to Rudy, who in turn remitted $27,000 to Ms. Alexandre. Ms. Alexandre then transferred the deed to the property to Rudy, who ultimately sold the property to Mr. Reynolds. No evidence was presented to show that the Debtor paid any money in connection with the purchase of the Rock Chapel property, and no evidence was presented to indicate that the Debtor received anything following the sale of the property. Since the Debtor had no interest in the house or in a house-flipping "business", a failure to disclose such an interest or to turn it over to the Trustee does not exist.

## INADEQUATE RECORDS

Plaintiffs contend the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(3) because the Debtor ceased using his bank account and ceased being paid upon notice of the judgment from Robbie White. Plaintiffs allege the Debtor utilized the bank account in the name of his brother Rudy to continue his financial and banking life, to conceal his financial condition and prevent the ascertaining of his transactions.

In the Court's review of case law under this section, almost without fail debtors who were denied a discharge under this section were debtors in business, such as attorneys, accountants, and real estate brokers. These debtors almost always held advanced degrees. See, e.g., Wilson, 33 B.R. at 689, Meridian Bank, 958 F.2d at 1226, and Hughes, 353 B.R. 486. On the other hand, courts that have granted the debtor a discharge in the face of a Section 727(a)(3) challenge have almost universally found the debtor to be relatively unsophisticated. See Devaul, 318 B.R. at 838 (debtor dropped out of high school at the beginning of his junior year); Floret, LLC v.

Sendecky (In re Sendecky), 283 B.R. 760, 764 (8th Cir. BAP 2002) (debtor's lack of education, sophistication and business experience explained his inadequate business records); G&J Investors v. Zell (In re Zell), 108 B.R. 615, 627 (Bankr. S.D. Ohio 1989) (debtor was relatively unsophisticated businesswoman); Energy Marketing Corp. v. Sutton (In re Sutton), 39 B.R. 390, 398 (Bankr. M.D. Tenn. 1984) (debtor was self-employed and had very little formal education).

The Court adopts the Devaul court's analysis of Section 727(a)(3). Plaintiffs established that, prior to Robbie White's judgment against the Debtor, he maintained a bank account, but no evidence was presented that the Debtor had maintained other books and records. The Court has found the Debtor was not in business as of the date of the petition or within the two years prior to the date of the petition. The Debtor received gifts from family and friends and did occasional work for cash such as assisting on home repairs. The Debtor, within the two years prior to the filing of the petition, was an unsophisticated consumer dealing primarily in cash. Plaintiffs' primary complaint is that the failure of the Debtor to maintain a bank account from which his cash transactions could be ascertained is a basis for the denial of a discharge. Plaintiffs point out rightfully that, if the Debtor had kept a bank account, it would enable the creditors and the trustee to better determine the Debtor's actual financial condition or business transactions. Thus, the Court concludes Plaintiffs have met their *prima facie* burden under Section 727(a)(3), as explained by Devaul.

The burden then shifts to the Debtor to show justification as to why the records (in this case a bank account) were not maintained. The courts have held that

> … justification depends largely on what a normal, reasonable person under similar circumstances would do. The inquiry should include the education, experience and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.

Wilson, 33 B.R. at 692.  Here, the Debtor only completed the ninth grade and is therefore relatively uneducated and unsophisticated.  The Debtor clearly has an inventive and bright mind, having been involved in the invention of several patented products.  But having an inventive or even mechanical mind does not mean one is financially sophisticated.

The Debtor's lack of financial sophistication can be seen through the course of his business transactions.  The Debtor seemed to always have someone other than himself responsible for the financial aspects of the business in which he was involved.  For many years, Larry Bradford was the person with NJUN who was responsible for the financial affairs of the business.  Later, Mr. Ringo became involved in the business and took control of the financial affairs.  No testimony was presented that the Debtor regularly handled the financial affairs of the NJUN Companies.  It is also clear from the testimony that any financial involvement the Debtor did have in the NJUN Companies was unsuccessful.  Robbie White testified to times when he loaned money to the Debtor and the Debtor could not repay him; the Debtor testified to having repaid cash to Robbie White for certain items or purchased items or paid other bills for Robbie White which the Debtor viewed as a setoff.  All of the transactions between the brothers were "loose".  They involved verbal agreements or documents not prepared by attorneys.  The transactions were mostly in cash.  Testimony also evidenced that it was the Debtor's financial difficulties which led Mr. Ringo to first become involved in the NJUN Companies, and it was the Debtor's lack of financial and management sophistication, among other items, that led the other members of the original NJUN company to seek a new investor that would have resulted in the Debtor's buyout and elimination of his position in NJUN.

Further, no evidence was presented that the Debtor ever maintained any records other than a bank account so his failure to have any records other than a bank account is justified as in his ordinary course of business.  The Court also notes that a review of the Debtor's bank

statements before the bank account was closed did not reflect any remarkable expenses.  The Debtor spent his money on food, gas, car payments, and insurance payments and a large portion of any cash he received was spent for supplies and expenses of the NJUN business.  The Debtor lived with his mother his entire life and never had household expenses to pay.  The Court notes that the Debtor's use of cash in the two years prior to the filing of the bankruptcy case was not significantly different than the way he had transacted business before June 2012 other than using a debit card previously and using cash subsequently.  While the Debtor did not have his own bank account in the two years prior to his filing, he did produce his brother's bank statements. He identified expenses paid through that account and total deposits made in the year preceding the petition.  Finally, the Court notes the Debtor was not living in a way as to incur additional credit during the two years prior to the filing of the bankruptcy petition.  A review of the Debtor's schedules shows that, other than debt related to his brother Robbie and the NJUN Companies, he had medical debt, the TitleMax loan for his car and credit cards which were last used more than two years prior to the filing of the bankruptcy case.

The Debtor's excuse for not continuing to maintain a bank account was that his prior bank account had been garnished by his brother and the Debtor needed to be able to use any cash he had to pay his bills.  The Court notes the Debtor's cessation of a bank account occurred more than two years before the filing of the bankruptcy case and therefore does not appear to have been in contemplation of filing bankruptcy.  The fact the Debtor may cease to use a bank account in order to avoid garnishments and/or judgment liens in and of itself is not sufficient to deny a discharge.  Watkins, 474 B.R. at 649.  Moreover, the "Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account…" Meridian Bank, 958 F.2d at 1230.  Although the Debtor did not keep a bank account, he did testify that he filed his tax

returns (the tax returns were not admitted into evidence) and Plaintiffs did not dispute that the returns were filed.

Lastly, the Court has already concluded above that the Debtor did not routinely use his brother's bank account as a way to conceal income.  The Debtor used his brother's bank account on a regular basis to pay his car insurance and he repaid his brother for his cell phone usage.  The Debtor also used his brother's account on several occasions to make payments on his car loan. The evidence did not support that the Debtor received additional income through his brother's accounts, which was being concealed and for which adequate records were therefore not kept.

The Debtor's income during the two years prior to the filing of the bankruptcy petition was less than $15,000 a year.  The Court simply cannot conclude that an individual debtor who makes less than $15,000 a year and who pays his bills largely in cash should be denied a discharge.  Many consumers in this country receive income and pay bills in cash and have no bank accounts.  It is for this reason case law has recognized that justification for not having records varies greatly based on the individual debtor.

> Obviously, an unsophisticated wage earner dealing primarily in cash should not be denied a discharge because he failed to keep books of account.  A higher standard of care is required, however, from a merchant actively engaged in credit transactions.

Goff, 495 F.2d at 201-202.

Considering all of the circumstances, the Court concludes the Debtor has justified his failure to maintain a bank account in the two years prior to the filing of the bankruptcy case and his discharge is not denied under Section 727(a)(3).

Finally, the Plaintiffs allege the Debtor's discharge should be denied under Section 727(a)(4)(D) because he withheld records and information from the Trustee.  Plaintiffs provided no proof of this allegation.  First, no evidence showed that the Trustee had requested specific

information or records, as required.  See Sadler, 282 B.R. at 264; Young, 346 B.R. at 615.

Second, Plaintiffs presented no evidence the Debtor failed to turn over any records or

information he had.  As such, Plaintiffs' claim to deny the Debtor a discharge under Section

727(a)(4)(D) fails.

### CONCLUSION

For the reasons set out herein, judgment is for the Debtor on all counts in the Complaint

seeking to deny the Debtor a discharge under 11 U.S.C. § 727.

**### END OF ORDER ###**

**<u>DISTRIBUTION LIST</u>**

Terrence Shannon
PO Box 91
Porterdale, GA 30070

Rocky Rene' White
PO Box 1884
Lilburn, GA 30048

Jason L. Pettie
Chapter 7 Trustee
Suite 150 - One Decatur Town Center
150 E. Ponce de Leon Avenue
Decatur, GA 30030